## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JAMICA BATES, MERYL BLAZER, CARISSA GILLESPIE, and TAMARA CESAR, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Civil Action No. |
| LINDA MCMAHON, in her Official Capacity as Secretary of the United States Department of Education, EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., and TRANSUNION, LLC, | |
| Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT

### I.    PRELIMINARY STATEMENT

1.

This is a consumer class action brought for willful violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FRCA"), against Defendant Linda McMahon, in her Official Capacity as the Secretary of the United States Department of Education, Defendant Equifax Information Services, LLC ("Equifax"), Defendant Experian Information Solutions, Inc. ("Experian"), and Defendant TransUnion, LLC ("TransUnion").

2.

This class action challenges the reckless, predatory, and unlawful practices of the United States Department of Education ("Defendant" or "Department"), which has forced millions of borrowers into reported serious delinquency and even wrongful default, destroyed their financial futures, and extracted billions of dollars by way of maliciously negligent credit bureau reporting and predatory lending and abusive collection practices. Since January 1, 2025, over five million individuals have been improperly declared to be in serious delinquency and many also declared to be in legal default on their federal student loans solely because the Department has failed in its basic duty to competently service its borrowers. The Department projects the number of student loan borrowers who will be declared to be in serious delinquency or declared to be legally in default will double to ten million by the end of 2025, and soar to twenty million by April 2026. The Department is the largest lender of consumer credit in the United States and has operated with the intent of extracting enormous profits by way of originating student loans and charging significant fees and interest rates on those loans.

3.

The Department, in or about 2010, entered the consumer lending market on a commercial basis in order to profit from American citizens' desires to better themselves through higher education. Critically, the Department has outstanding

loans on its books of more than $1.6 trillion for more than 43 million borrowers, but it does not have the operational infrastructure to properly service, keep track of, or collect on its student loans granted. Due to the Department's operational failures, millions of Americans have been placed wrongfully in serious delinquency or legal default by the Department, unfairly reported as delinquent or in default to the three major credit bureaus (Equifax, Experian and TransUnion), and had their credit scores negatively impacted as a result. The Department is legally designated as a "Furnisher" of credit information to each of the three major credit bureaus, and as such, is legally bound to adhere to the Fair Credit Reporting Act.

4.

The delinquency and defaults being reported to the credit bureaus are not the product of borrower irresponsibility. These defaults are the willfully negligent direct result of the Department's collapse in servicing capacity, a collapse caused by lack of Department leadership understanding how to meet operational responsibilities, mass layoffs, inadequate contracting with servicing organizations, broken operating systems, and underfunding for student loan servicing, along with a lack of attention to the fiduciary duties associated with loan servicing, all brought into focus as the Department restarted repayment obligations in 2025 after the COVID-19 pause of more than five years in deferment.

5.

Due to the Department's administrative policies and practices, millions of student loan borrowers have tried in good faith to become current in their student loan obligations, but the Department has made it impossible for them to pay or to even contact someone about restarting payment. Instead, student loan borrower accounts are mechanically marched through 30-day, 60-day, 90-day, 120-day delinquencies, and then declared to be legally in default at 270 days, along the way being unfairly reported to the credit bureaus as being delinquent or in default.

6.

Once declared in default, and even before periods of serious delinquency, the Department knowingly reports the unfair and inaccurate default and delinquency statuses to the three major credit reporting agencies, Defendant TransUnion, Defendant Equifax, and Defendant Experian, devastating borrowers' credit scores, increasing their cost of borrowing, and triggering wage garnishment and other draconian collection measures by the federal government. The Department and the U.S. Department of Treasury are also preparing to engage third-party private collection agencies to start hard-core collection activities as well.

7.

The scale of the harm is staggering. Each Plaintiff and member of the class will suffer at least $100,000.00 in damages due to inflated interest rates, ruined credit

scores, loss of job and housing opportunities, and predatory collection practices, not even considering harmful emotional stress. Multiplied across five million borrowers currently declared to be in default, the Department's misconduct has and will cause no less than $500,000,000,000.00 (five hundred billion dollars) collectively in personal financial damage, a figure that will rise to $2,000,000,000,000.00 (two trillion dollars) by April 2026 if left unchecked.

8.

The Department's credit bureau reporting scheme is not accidental. Insiders have confirmed to Plaintiffs that the Department reports unfair and inaccurate information to the credit bureaus for one reason: to weaponize the credit reporting system as a back-end collection tool. The Department knows that once a borrower's credit score is destroyed, the borrower will be forced to somehow connect with the Department, cap in hand, to beg for relief. Additionally, the Department will eagerly move forward with draconian collection practices of Administrative Wage Garnishments and the seizing of government checks. The use of credit bureaus as a collection method is made even more insidious because the Department is using negative credit reporting in order to force borrowers to contact the Department since the Department apparently only has correct contact information for approximately thirty percent of its borrowers and has made no responsible attempts to determine correct contact information. This conduct is unconscionable, unlawful, and

unconstitutional. The Department has a duty to perform operational servicing to a normally expected standard and has a very specific legal duty to be both fair and accurate in reporting information into the files of the credit bureaus. It is one thing for the Department to be inept in its servicing and default resolution practices; it is unconscionable for the Department to use unfair credit reporting practices as a way to mitigate the Departments ineptitude.

9.

Defendants Equifax, Experian, and TransUnion are credit bureaus, responsible for collecting information from credit furnishers such as the Department in order to generate credit reports used by consumer lenders to make lending decisions. Additionally, credit reports are used in determining housing eligibility, employment eligibility, and even national security clearances. Under the Fair Credit Reporting Act ("FCRA"), Defendants Equifax, Experian, and TransUnion are obligated to ensure fair and accurate credit reporting and must ensure the information they rely on to generate credit reports is likewise fair and accurate. Defendants Equifax, Experian, and TransUnion have violated the FCRA by failing to ensure their credit reports are based on fair and accurate information and have seriously damaged Plaintiffs as a result.

10.

The FCRA regulates Defendant's actions by requiring they ensure the

information they provide respectively and rely on is both fair and accurate. Studies conducted and reported by the credit bureaus point to the credit bureaus themselves openly acknowledging in the press that they are concerned about the level and nature of information being provided by the Department. Indeed the credit bureaus studies go so far as to encourage lenders to look past student loan delinquency and defaults being shown in their credit reports.

11.

At issue in the instant action is the Department's failure to meet its operational responsibilities associated with managing the student loan accounts of the millions of Americans who have borrowed from the Department.

12.

Critically, Student Loans were deferred at the end of the first Trump Administration and during all of the Biden Administration, and borrowers could defer their payment obligations during that time. Of highly significant importance is that, during an almost five year period of deferment, no attempts were made by the Department to maintain accurate contact information of student loan borrowers, and likewise, no serious attempts have been made nor are being made currently to do so. Moreover, during this period of deferment no negative reporting of credit information was made to the three credit bureaus and as such, all loans were deemed for credit reporting purposes of being in good standing.

13.

In or about September 2024, the Biden Administration made the decision to restart student loan borrowers' payment obligations, allowing for an on-ramp period of time for borrowers to restart payments. During this period of time the Department should have executed responsible actions to establish contact with borrowers, which it did not do. If, during the five year period of deferment, the Department had taken action to maintain borrower contact, then the unfair credit reporting alleged herein may have been alleviated or avoided.

14.

In or about January 2025, the Trump Administration announced that student loans would no longer be deferred, that borrowers must return to paying off their loans, and that those who failed to do so, regardless of any failed attempts by borrowers to contact the Department in order to re-establish payments, would be placed in default. Also on April 21, 2025, U.S. Secretary of Education Linda McMahon announced that collections of student loans would restart on Monday May 5, 2025 and that borrowers would be notified of such with email, which, itself, is clearly an inadequate notification method. Nowhere in the Higher Education Act does it state that email communication is an appropriate or proper method for notice of intent to collect on delinquent or defaulted loans. A clear intent of these announcements was to get borrowers to contact the Department in order to make up

for the gross inadequacy of the Department in putting forth efforts and resources to establish positive contact with student loan borrowers. More obvious is that futile attempts at noticing borrowers was to provide the Department with flimsy legitimacy to place people in negative status with the credit bureaus and initiate draconian treasury collection activities.

15.

On April 22, 2025, White House Press Secretary Karoline Leavitt declared that student loan collections would restart with forceful intent toward collections.

16.

The Department also began an attempt to send letters to borrowers informing borrowers that they must begin repayment of their student loans.  With malice or incompetence,  however, the Department sent out these letters knowing that more than 70% of any form of notice would not be received by the intended recipients due to lack of efforts by the Department to establish and maintain contact with student loan borrowers. The Department also knew that borrowers who were not contacted would proceed thru delinquency and into reported default with the credit bureaus. This was again a flimsy way for the Department to attempt to legitimize its obligation to notice borrowers of intent to undertake draconious treasury collection actions.

17.

Following each of these return-to-repayment announcements, and continuing to date, the Department was and remains ill-equipped to handle the influx of borrowers' efforts by phone, mail, and electronic means to begin repayment of their loans, therefore causing borrowers to be unfairly reported as being delinquent or in default, specifically causing their credit scores to plummet.

18.

Call wait times to the Department and its servicers routinely exceed ten (10) hours, abandoned call rates have exceeded ninety-five percent (95%), and millions of pieces of mail and repayment plan applications are backlogged.

19.

Nonetheless, the Department has allowed its automated system to categorize borrowers as being in states of serious delinquency or legal default, despite knowing that borrowers are trying but unable to begin repayment plans to avoid default and despite knowing that the Department's contact information for borrowers is incorrect more than seventy percent of the time.

20.

Once a borrower is placed in serious delinquency or default by the Department's automated system, the unfair negative credit categorization is sent to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

21.

The reporting of a seriously delinquent or default categorization severely damages borrowers' credit scores, destroying their ability to secure future loans, lease apartments or secure employment.

22.

Rather than taking steps to provide adequate loan services capabilities so as to curb the unfair categorization of serious delinquency or default upon borrowers, the Department of Education unfairly represents to Defendant Experian, Defendant Equifax, and Defendant TransUnion, and the media that millions of Americans are "deadbeat" borrowers who simply refuse to begin repayment of their student loans.

**JURISDICTION AND VENUE**

23.

This action arises under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x, wherein Plaintiffs seek to redress the financial harm that they incurred as a result Defendants' violations of the FCRA. Jurisdiction of this Court is invoked under 28 U.S.C. § 1331.

24.

Venue is proper in this Judicial District based upon 28 U.S.C. § 1391(b) because all Defendants maintain offices in Georgia and at least one Defendant, Equifax, resides within this Division of this District Court. Plaintiff Tamara Cesar is

a resident of Georgia, and the other Plaintiffs consent to this venue by the filing of this action.

## PARTIES

### 25.

Plaintiff Jamica Bates (hereinafter, "Bates") is a citizen of the United States and a resident of the State of Virginia.  At all times relevant to this suit, Ms. Bates is a student loan borrower who received loans from the Department that Ms. Bates believes currently total approximately $268,000, including interest currently due.

### 26.

Plaintiff Meryl Blazer (hereinafter, "Blazer") is a citizen of the United States and a resident of the State of Washington.  At all times relevant to this suit, Ms. Blazer is a student loan borrower who received loans from the Department that Ms. Balzer believes currently total approximately $40,000, including interest currently due.

### 27.

Plaintiff Carissa Gillespie (hereinafter, "Gillespie") is a citizen of the United States and a resident of the State of Illinois.  At all times relevant to this suit, Ms. Gillespie is a student loan borrower who received loans from the Department that Ms. Gillespie believes currently totals approximately $18,000, including interest currently due.

28.

Plaintiff Tamara Cesar (hereinafter, "Cesar") is a citizen of the United States and a resident of the State of Georgia. At all times relevant to this suit, Ms. Cesar is a student loan borrower who received loans from the Department that Ms. Cesar believes currently totals approximately $81,000, including interest currently due.

29.

The Department is a federal department that oversees the Federal Student Aid Program, which provides loans to millions of Americans. The Department may be served with process by delivering copies of the Complaint and Summons to the Department's General Counsel of Deputy General Counsel at 400 Maryland Avenue SW, Washington, D.C. 20202, either by mail or personal service, by delivering a copy to the United States Attorney for the Northern District of Georgie, and sending a copy to the Attorney General of the United States in Washington, D.C.

30.

Defendant Equifax Information Services, LLC (herein, "Equifax") is a credit bureau that operates in the United States. Equifax receives information from the Department, generates credit reports, and provides lenders with those credit reports for the lenders to make determinations regarding individuals abilities to receive loans. Equifax may be served with process via its Registered Agent, Corporation

Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

31.

Defendant Experian Information Solutions, Inc. (herein, "Experian") is a credit bureau that operates in the United States. Experian receives information from the Department, generates credit reports, and provides lenders with those credit reports for the lenders to make determinations regarding individuals abilities to receive loans. Experian may be served with process via its Registered Agent, CT Corporation Systems, at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

32.

Defendant TransUnion, LLC (herein, "TransUnion") is a credit bureau that operates in the United States. TransUnion receives information from the Department, generates credit reports, and provides lenders with those credit reports for the lenders to make determinations regarding individuals abilities to receive loans. TransUnion may be served with process via its Registered Agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

**STATEMENT OF FACTS**

33.

Plaintiffs hereby plead and incorporate by reference all of the allegations contained in Paragraphs 1 through 32, as if the same were set forth herein.

34.

During the COVID-19 emergency, the Department paused federal student loan payments.

35.

In 2025, the Department aggressively restarted the program of collections without adhering to its fiduciary duty to assess whether it had adequate staffing, technology, or systems to support and service borrowers, and to ensure that it had the operational capabilities to do so.

36.

In fact, instead of increasing staff and upgrading its technology, the Department issued an agency-wide reduction-in-force (RIF) and attempted, on several occasions, to dismantle the agency.

37.

The Department is severely understaffed due to government layoffs and operates with outdated, faulty systems and operational processes that prevent timely servicing of loans and proper responsiveness to borrowers.

38.

Millions of borrowers have attempted to and continue to attempt to contact the Department to make payments, adjust repayment plans, or request relief, but are unable to do so because of the willful operational negligence of the Department.

39.

The Department's systems and contracted servicers could not and still cannot handle the demand, leaving calls unanswered, mail not replied to, online portals broken, and borrowers unable to comply with "return to repayment" through no fault of their own.

40.

The Department nevertheless advanced borrowers through delinquency stages — 30, 60, 90, 120, and 270 days — and declared them in default.

41.

Once in delinquency or default, the Department reported and continues to report unfair and inaccurate data to TransUnion, Equifax, and Experian. The Department does so knowingly, despite awareness that borrowers acted in good faith.

42.

Department insiders confirm that the Department's purpose in unfairly reporting this negative credit data to the credit bureaus is to coerce borrowers back into the Department's control — to force them to "repair" their credit reports and avoid wage garnishment. The Department knows however that once a borrower is reported as seriously delinquent or in default that the damage from reduced credit scores is long lasting, yet the Department has been and continues to be inexplicably

callous to these consequences. Most saddening is that the Department is not operationally capable of handling the inbound communication by borrowers caused by their actions.

43.

The damage to the current and future financial state of student loan borrowers brought about due to the operational failures and unlawful furnishing of unfair information to the credit bureaus by the Department is catastrophic: ruined credit scores; higher interest rates on credit cards, auto loans, and mortgages; as well as impacts related to access to credit cards, auto loans, mortgages, and jobs; and forced garnishment of wages.

44.

Each Plaintiff and member of the class is suffering $100,000 and more in damages. With five million people already harmed, the scale of damage is unprecedented in modern consumer finance. The number of borrowers that could be harmed by this unfair reporting scheme could exceed 20 million people.

**THE DEPARTMENT'S ROLE AS A CREDIT INFORMATION FURNISHER**

45.

On or about 2010, the Obama Administration eliminated the federal guaranteed loan program and private lenders' abilities to offer Americans student loans at low interest rates.

46.

The Obama Administration, as a result, placed the responsibility of providing student loans solely upon the Department through its direct federal student loan program. This was done expressly for the purpose at generating fee and interest income for the United States government.

47.

The Department now has more than $1.6 trillion in student loans to American borrowers, making the Department the largest consumer creditor in the United States, which also makes the Department the single largest furnisher of consumer credit information to the three credit bureaus. As the single largest provider of consumer credit information, it is imperative that the Department be exceptional in its operational executions and that it operate to the same standards to which regulated financial institutions must adhere.

48.

Due to the Department's commercial entrance into the lending business it is held to the same standards as any other lender, including those set forth in the Fair Credit Reporting Act. It is most interesting to note that the Department chose to be a credit information furnisher solely for use as a back-end collection tool. The Department does not use credit bureau reported information in determining to make determinations concerning undergraduate student loans, so serious questions should

be raised as to why the Department ever reports information to the credit bureaus, other than for use as a collection tool. Clearly the Department does not understand the purpose or intent of the FCRA, and by its actions demonstrates that it does not understand its obligations to comply with FCRA, or alternatively its leadership simply does not care to be held accountable to comply.

49.

Moreover, the Department is required by law to effectuate an operating scheme that allows the Department to provide for the allowability of borrowers to make payments on outstanding loans and to communicate with borrowers sufficiently to allow repayment and to operationally accommodate borrowers that are trying their best to repay; and one of the main reasons and obligations for doing so is to ensure that credit information is fairly and accurately reported to the credit bureaus, which it is not due to serious operational failures of the Department.

50.

From March 2020 and throughout the Biden Administration until September 1, 2023, loans were deferred, meaning that borrowers were not required to continue repayment of their loans.

51.

Towards the end of the Biden Administration, it was announced that loans would no longer be deferred, and borrowers would be required to continue

repayment.

52.

At the beginning of President Trump's second term, the Department made significant mass media announcements that borrowers would need to begin repayment of their loans once again.

53.

Millions of American borrowers paid attention to these announcements and attempted to contact the Department to set up a repayment plan.

54.

However, the Department was not and is not equipped to handle the influx of borrowers' communications via mail, telephone calls, and electronic means. A consequence of this failure is that negative information is unfairly reported to the credit bureaus.

55.

In fact, wait times for calls by borrowers to the Department were frequently over ten (10) hours long and have a 95% call abandonment rate.

56.

As a result, borrowers are unable to start a repayment plan with the Department; nor are they able to even inquire as to their outstanding balance on loans due to the Department.

57.

The few borrowers who were and are able to reach someone at the Department could not, and still even today cannot, ascertain the amount owed on their student loans or repayment plan they should be in because the Department plainly does not have adequate and properly trained staff and systems to do so.

58.

Rather than fixing its lack of communication and servicing support with borrowers, the Department continues its automated system that places borrowers into serious delinquency and into legal default and in turn unfairly reports this negative credit information to the credit bureaus.

59.

The Department began attempting to send delinquency notices to borrowers who were entirely unaware that they needed to begin repayment on their loans, with the Department knowing full well that it did not have adequate contact information on more than 70% of student loan borrowers.

60.

Consequently, many of these delinquency notices were sent to incorrect mailing addresses and incorrect email addresses of borrowers. The Department knew that these notices would not be received, yet conducted its business under the excuse

that they sent notices to last addresses of record.

61.

Although the loan agreements executed between the Department and the borrowers state that borrowers must update to keep their addresses current, many borrowers called and sent in mail, and notified servicers with the intent of updating their addresses but were unable because of the Department's failure to provide adequate methods for communication to and from borrowers, as evidenced by the extremely long wait times and extremely high call abandonment rates and millions of pieces of unopened mail.

62.

Moreover, borrowers who did receive the notice regarding repayment were unable to begin repayment because they could not contact the Department to set up a repayment plan or even determine how much they owed on their loans.

63.

Despite setting up a repayment plan with the Department being impossible, millions of American borrowers have been placed in serious delinquency or default due to the Department's faulty automated system that tracks borrowers' statuses on their loan balance.

64.

Complicating repayment for borrowers is that there are multiple, complex

repayment systems that are in place.  Federal loans offer multiple repayment plans, forgiveness pathways, and deferment options, and the system is extremely fragmented and hard to navigate.  In fact, borrowers often do not know which plan is best for them or how to switch between repayment plans. In order to navigate thru these options borrowers must be able to speak with Department designated service personnel.

65.

Moreover, servicers of federal student loans frequently provide inconsistent or inaccurate information to borrowers, who face lengthy wait times in trying to reach the servicers of the debt.  The servicers also lose paperwork from borrowers, and there are processing delays that prevent borrowers from accessing help from the servicers in time to avoid default.

66.

Once a borrower is placed in serious delinquency or in default, the negative credit status categorization is sent to Experian, Equifax, and TransUnion.

67.

The negative credit status categorization is then used by Experian, Equifax, and TransUnion to generate credit reports and credit scores based on the unfair delinquency or default categorizations.

68.

Upon being categorized as seriously delinquent or defaulted, borrowers' credit scores drop considerably.

69.

Due to the decrease in borrowers' credit scores, borrowers are unable to secure financing for things such as cars, houses, or further education. Also, lowered credit scores can cause interest rates on existing loans to increase. Moreover, lower credit scores can negatively impact ability to rent an apartment, get utilities, or even get a job.

70.

Unlike most consumer debt, defaulting on federal student loans can trigger Federally administrated wage garnishment, tax refund seizure, and Social Security offsets without any court process. These financial penalties can deepen borrowers' financial instability and make recovery from low credit scores even more difficult.

71.

There are also limited pathways out of default, with rehabilitation and debt consolidation being the main tools. Both of these are time-consuming, complex, and poorly explained to borrowers, deepening the harm to them.

72.

Unlike any other form of consumer or even commercial debt, student loans

cannot be discharged in bankruptcy, except in exceptional cases.

73.

The Department, through its various offices and contracted loan servicers, furnishes borrower account information concerning millions of federal student loan accounts to the nationwide consumer reporting agencies, Defendant Equifax, Defendant Experian, and Defendant TransUnion, on a recurring and systematic basis.

74.

As a result, the Department is a "furnisher of information" within the meaning of 15 U.S.C. § 1681s-2. As such, the Department bears two core statutory obligations: (a) To provide information that is fairly reported, accurate and not materially misleading when furnishing consumer data to the credit reporting agencies, 15 U.S.C. § 1681s-2(a); and (b) To conduct a timely, thorough, and reasonable investigation of disputed information upon receipt of notice from a consumer reporting agency, and to correct, delete, or block inaccurate or unverifiable information, 15 U.S.C. § 1681s-2(b).

75.

Despite these clear statutory mandates, the Department has consistently failed to fulfill its role as a responsible furnisher of consumer credit information. Most disturbing is that the Department does not appear to understand its obligations under

FCRA, very likely brought about because the Department has abandoned its congressionally mandated requirement to administer the Office of Federal Student Aid as a Performance Based Organization ("PBO") staffed with executives with financial industry experience.

### SYSTEMIC INACCURACIES

76.

The Department's systemic failures in its reporting practices have resulted in widespread dissemination of unfair, inaccurate, and misleading credit information, affecting millions of federal student loan borrowers nationwide.

77.

These inaccuracies include, but are not limited to: (a) loans improperly reported as delinquent or in default despite borrowers being in repayment, deferment, forbearance, or other non-delinquent statuses; (b) payments that were timely made but misapplied, lost, or otherwise not properly reflected on borrowers' credit files; (c) balances reported incorrectly following loan forgiveness, discharge due to disability, death, or other statutory discharge events; (d) improper continuation of derogatory reporting after a loan was rehabilitated, consolidated, or otherwise returned to good standing; and (e) erroneous reporting of loans that had been transferred to other servicers or resolved by settlement.

78.

These systemic inaccuracies persisted even after borrowers exercised their statutory right to dispute inaccurate information with the consumer reporting agencies.

79.

The Department, rather than correcting its errors, routinely re-reported and continues to report the same unfair and inaccurate information, thereby compounding the harm to borrowers.

### FAILURE TO INVESTIGATE

80.

Upon receiving Automated Consumer Dispute Verification ("ACDV") notices from the consumer reporting agencies, the Department routinely: (a) conducts only cursory or perfunctory "investigations" that consists primarily of automated responses and superficial database checks; (b) fails to review underlying loan account histories, payment records, correspondence with borrowers, or other relevant documentation that would have confirmed the unfairness and inaccuracy of its reporting; (c) rubber-stamps its prior reporting as "verified," even where borrower disputes provided documentary proof of the Department's errors; and (d) continues to furnish the same unfair and inaccurate information to the consumer reporting agencies, in knowing, reckless disregard of the truth.

81.

The Department's failure to investigate was not the product of isolated errors, but rather a systemic and institutionalized pattern of disregarding its statutory duties under the FCRA. Based upon the Department's blinded operational actions, it appears that the Department does not understand its obligations under FCRA.

### *HARM TO BORROWERS*

82.

As a direct and proximate result of the Department's unfair and inaccurate credit reporting and failure to investigate, millions of borrowers have suffered concrete and particularized harm, including but not limited to: (a) reductions in credit scores, often by dozens or even hundreds of points; (b) denial of credit, or extension of credit on materially worse terms, including higher interest rates and fees; (c) inability to qualify for mortgages, automobile loans, small business loans, or rental housing; (d) loss of current or prospective employment opportunities due to adverse credit reports being considered in hiring decisions; and (e) emotional distress, humiliation, and reputational injury from being unfairly branded as delinquent or in default on federal obligations.

## *CLASS ACTION ALLEGATIONS*

### 83.

*Class Definition*: Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of all persons in the United States who, within the applicable limitations period, had federal student loans serviced or owned by the Department and had inaccurate or misleading categorizations of delinquency and/or default furnished by the Department to any consumer reporting agency.

### 84.

*Numerosity*: The proposed class numbers in the millions. The Department's own public reporting acknowledges that more than five million borrowers have been affected by default or delinquency reporting errors, making joinder of all members impracticable.

### 85.

*Commonality*: The claims of the class raise common questions of law and fact, including: (a) whether the Department furnished unfair and inaccurate information regarding borrowers' federal student loans; (b) whether the Department failed to conduct reasonable investigations of disputed information after receiving notice from consumer reporting agencies; (c) whether the Department's failures were negligent, reckless, or willful under the Fair Credit Reporting Act; and (d) the appropriate measure of damages and equitable relief.

86.

*Typicality*: Plaintiff's claims are typical of the claims of all class members, as they arise from the same course of conduct by the Department and are based on the same legal theories.

87.

*Adequacy*: Plaintiffs will fairly and adequately protect the interests of the class. Plaintiff's interests are aligned with those of the class, and Plaintiffs have retained counsel that is experienced in prosecuting complex consumer protection and class action litigation.

88.

*Predominance and Superiority*: Common questions of law and fact predominate over any individual issues. A class action is superior to individual litigation because: (a) the class members are numerous and geographically dispersed, making joinder impracticable; (b) the damages suffered by individual class members are relatively small compared to the cost of individual litigation, rendering individual suits economically infeasible; and (c) a class action will achieve economies of scale, promote judicial efficiency, and provide uniform adjudication of borrowers' rights under the FCRA.

### STATEMENT OF FACTS SPECIFIC TO CLASS MEMBER JAMICA BATES

89.

Ms. Bates executed an agreement with the Department to receive federal student loans.

90.

Plaintiff Bates was informed that her student loans would be deferred indefinitely.

91.

In September 2023, Plaintiff Bates was informed that she must return to making payments on her outstanding student loan balance of $268,000.

92.

Ms. Bates called the Department intending to set up a payment plan and return to making payments on her student loans.

93.

Ms. Bates was unable to speak with someone at the Department because her calls were ultimately abandoned.

94.

Like other borrowers, Ms. Bates could not start a payment plan with the Department because Ms. Bates could not communicate with anyone at the Department.

95.

As a result, Ms. Bates was programmatically and unfairly categorized by the student loan processing system as being seriously delinquent on payments until Ms. Bates was ultimately placed in default.

96.

Ms. Bates' unfair and wrongful categorization of default was reported by the Department to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

97.

Ms. Bates disputed the categorization of default and decrease in credit score with Defendants on multiple occasions, but Defendants did not ameliorate the negative credit impact.

98.

Ms. Bates' credit score was damaged because the Department supplied unfair and wrongful categorizations of seriously delinquent or ultimately as in default to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

### STATEMENT OF FACTS SPECIFIC TO CLASS MEMBER MERYL BLAZER

99.

Ms. Blazer executed an agreement with the Department to receive federal student loans.

100.

Ms. Blazer was informed that her student loans would be deferred indefinitely.

101.

In September 2024, Ms. Blazer was informed that she must return to making payments on her outstanding student loan balance of $40,000.

102.

Ms. Blazer called the Department intending to set up a payment plan and return to making payments on her student loans.

103.

Ms. Blazer was unable to speak with someone at the Department of Education because her calls were ultimately abandoned.

104.

Like other borrowers, Ms. Blazer could not start a payment plan with the Department because Ms. Blazer could not communicate with anyone at the Department.

105.

As a result, Ms. Blazer was sent delinquency notices until Ms.Blazer was ultimately placed in default.

106.

Ms. Blazer's unfair and wrongful categorization of default was reported by

the Department to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

107.

Ms. Blazer disputed the categorization of default and decrease in credit score with said credit reporting Defendants, but Defendants did not ameliorate the negative credit impact.

108.

Ms. Blazer's credit score was damaged because the Department supplied wrongful and unfair categorization of default to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

### STATEMENT OF FACTS SPECIFIC TO CLASS MEMBER CARISSA GILLESPIE

109.

Ms. Gillespie executed an agreement with the Department to receive federal student loans.

110.

Ms. Gillespie was informed that her student loans would be deferred indefinitely.

111.

In September 2023, Ms. Gillespie was informed that she must return to

making payments on her outstanding student loan balance of $18,000.

112.

Ms. Gillespie called the Department intending to set up a payment plan and return to making payments on her student loans.

113.

Ms. Gillespie was unable to speak with someone at the Department because her calls were ultimately abandoned.

114.

Like other borrowers, Ms. Gillespie could not start a payment plan with the Department because Ms. Gillespie could not communicate with anyone at the Department.

115.

As a result, Ms. Gillespie was sent delinquency notices until Ms. Gillespie was ultimately placed in default.

116.

Ms. Gillespie's unfair and wrongful categorization of default was reported by the Department to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

117.

Ms. Gillespie disputed the categorization of default and decrease in credit

score with said credit reporting Defendants, but Defendants did not ameliorate the negative credit impact.

118.

Ms. Gillespie's credit score was damaged because the Department supplied unfair and wrongful categorization of default to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

***STATEMENT OF FACTS SPECIFIC TO CLASS MEMBER TAMARA CESAR***

119.

Ms. Cesar executed an agreement with the Department to receive approximately $80,000 in student loans from 2018-2022.

120.

Ms. Cesar was informed that her student loans would be deferred indefinitely.

121.

In September 2023, Ms. Cesar was informed that she must return to making payments on her outstanding student loan balance of $81,000.

122.

Ms. Cesar called the Department intending to set up a payment plan and return to making payments on her student loans.

123.

Ms. Cesar was unable to speak with someone at the Department because her

calls were ultimately abandoned.

124.

Like other borrowers, Ms. Cesar eventually was able to set up a payment plan with the Department, but the monthly payments under that plan are astronomically and unrealistically high and likely cannot be met. This plan was eventually set up online with no actual personal information with anyone at the Department.

125.

As a result, Ms. Cesar was sent delinquency notices until Ms. Cesar was ultimately placed in default.

126.

Ms. Cesar's unfair and wrongful categorization of default was reported by the Department to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

127.

Ms. Cesar's credit score was damaged because the Department supplied unfair and wrongful categorization of default to Defendant Experian, Defendant Equifax, and Defendant TransUnion.

128.

Additionally, Ms. Cesar works in the banking industry, and due to the damage to her credit score, she has had a job offer rescinded and is unable to leave her current position to move to another position in the banking industry. Even with a payment

plan in place, the Department has made no effort to repair Ms. Cesar's credit score or retract the unfairly reported information to the credit bureaus.

129.

Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action individually and on behalf of the following class initially defined as follows (the "Class"): All persons residing in the United States and its Territories who have since January 1, 2025 been categorized as seriously delinquent or in default by the Department of Education and have had that categorization of default sent to credit bureaus.

130.

Plaintiffs reserve the right to amend the above definition based upon developments in discovery or as otherwise appropriate and permitted.

131.

The class is so numerous that joinder of all members is impracticable. Although the precise number of class members is known only to Defendants, Plaintiffs aver upon information and belief that the class minimally will number in the millions.

132.

There are questions of law and fact common to the class that predominate over any questions affecting only individual class members. The principal questions are whether Defendants violated the FCRA by reporting and relying on information that

is unfair and inaccurate; whether the violations of the FCRA are negligent, willful, or reckless; and whether members of the class and potential subclasses are entitled to specific credit bureau data relief, statutory damages, multiple aspects of injunctive relief, actual and/or punitive damages, and in what amounts.

133.

Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs are committed to zealously litigating this matter and have retained counsel and supporting counsel that is experienced in litigating class actions and claims under the FCRA. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue those claims.

134.

This action should be maintained as a class action because the questions of law and fact common to class members predominate over any questions affecting only individual class members, and because a class action is a superior method for the fair and efficient adjudication of this controversy. Defendants' conduct described in this Complaint stems from standard practices, resulting in violations of the FCRA common among all class members. Class members do not have any interest in pursuing separate actions against Defendants, as the amount of each class member's claim is small compared to the expense and burden of individual prosecution given the staggering number of class members, especially in comparison with the

enormous, Goliath level, resources available to the Defendants to fight each such lawsuit. Class certification will also obviate the need for duplicative litigation that may result in inconsistent judgments concerning Defendants' conduct. Moreover, management of this suit as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

135.

This action should be maintained as a class action because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the party opposing the class, as well as a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of class members not parties to the adjudications or substantially impair or impede their ability to protect their rights.

## COUNT I:
## VIOLATIONS OF FCRA SECTION 1681s-2
### (Defendant Department of Education)

136.

Plaintiffs hereby plead and incorporate by reference all of the allegations contained in Paragraphs 1 through 135, as if the same were set forth herein.

137.

The Department is bound by federal law to ensure that the information it provides to consumer credit bureaus is both fair and accurate, and that its actions are fully compliant with the FCRA.

138.

Section 1681s-2 of the FCRA provides that a "person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is unfair or inaccurate."

139.

In 2024, the Supreme Court of the United States clarified that a "person" under the FCRA includes governmental agencies, such as the Department. *Dep't of Ag. Rural Development Rural Housing Svs. v. Kirtz,* 601 U.S. 42, 43 (2024).

140.

Specifically, Section 1681a of the FCRA defines "person" to include "any…governmental…agency." *Kirtz,* 601 U.S. at 43.

141.

As a result, the Department is not sovereignly immune from suit by individuals seeking relief under the FCRA.

142.

The Department has failed and continues to fail to meet its obligations set forth in the FCRA.

143.

The Department made the decision in or about October 2024 to begin the process of reinstating borrowers' obligations to make payments on their student loans. This was specifically acted upon by the Department in January 2025.

144.

However, the Department was and continues to be entirely unprepared to handle the amount of borrowers' requests to be placed back on a payment plan.

145.

Eventually, the Department very publicly announced that it would begin declaring moving borrowers toward delinquency and default in or about April 2025.

146.

Millions of borrowers then reached out to the Department seeking information about payment plans, the balance remaining on their student loans, and many attempted to update their address and other pertinent information with the Department.

147.

Unfortunately, the Department was not prepared to handle this influx of calls

and failed to accommodate borrowers' need for information, payment plans, and updates of personal information.

148.

Despite the Department's inability to serve its borrowers, it began to place borrowers in categories of delinquency and default via an automated system.

149.

The Department's automatic system of tracking borrowers' status on their loans placed borrowers in the first stage of delinquency after 30 days of missed payments, the second stage of delinquency after 60 days of missed payments, the third stage of delinquency after 90 days of missed payments, the fourth stage of delinquency after 120 days of missed payments, and ultimately in the default category after 270 days of missed payments.

150.

These categorizations of delinquency beginning at 90 days and continuing to be categorizing as in-default were reported by the Department to Defendants Experian, Equifax, and TransUnion.

151.

Upon being categorized as seriously delinquent or in default, and reported to Defendants Experian, Equifax, and Transunion, borrowers' credit scores decreased significantly, and very unexpectedly since there had been no noticing of delinquency

at 30 days or at 60 days was entirely unexpected and not at all preventable by borrowers.

152.

The borrowers' decrease in credit scores were then reported by Experian, Equifax, and TransUnion to borrowers' respective credit card companies which raised borrowers' interest rates.

153.

Critically, the borrowers' reported seriously delinquent or default statuses submitted to the credit bureaus were neither fair nor accurate.

154.

The borrowers' negative credit statuses were unfair because they were based on the Department's automated system which rolled borrowers into default with no regard to whether the borrowers attempted to have themselves placed back on a payment plan.

155.

Again, the Department lacked and continues to lack the means necessary to process borrowers' requests to be placed back on payment plans, update their addresses, or even to validate their outstanding balance.

156.

Additionally, many of the borrowers never received notice that their account

with the Department were headed towards a default status because the borrowers were unable to update their addresses with the Department and, as a result, the Department did not send such notices to the correct addresses of borrowers.

157.

Therefore, the information reported to the credit bureaus which damaged borrowers' credit scores was unfair and inaccurate.

158.

As a result, Plaintiffs and the class are entitled to statutory damages of no less than $100,000 per violation, punitive damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681n.

## COUNT II:
## NEGLIGENT VIOLATION OF FCRA SECTION 1681o
### (Defendant Department of Education)

159.

Plaintiffs hereby plead and incorporate by reference all of the allegations contained in Paragraphs 1 through 135, as if the same were set forth herein.

160.

In the alternative to Count I, the Department negligently failed to comply with 15 U.S.C. § 1681s-2(b) by failing to investigate borrower disputes with the degree of care required of a reasonable furnisher as credit performance information.

161.

The Department is bound by federal law to ensure that the information it provides to consumer credit bureaus is fair and accurate and in full compliance with FCRA.

162.

Section 1681s-2 of the FCRA provides that a "person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is unfair or inaccurate."

163.

In 2024, the Supreme Court of the United States clarified that a "person" under the FCRA includes governmental agencies, such as the Department. *Kirtz,* 601 U.S. at 43.

164.

Specifically, Section 1681a of the FCRA defines "person" to include "any…governmental…agency." *Kirtz,* 601 U.S. at 43.

165.

As a result, the Department is not sovereignly immune from suit by individuals seeking relief under the FCRA.

166.

The Department failed to meet its obligations set forth in the FCRA.

167.

The Department made the decision in or about September 2024 to begin the process of reinstating borrowers' obligations to make payments on their student loans starting in October 2024. A return to repayment "on ramp" period was put in place by the Biden administration and payments were officially restarted in January 2025.

168.

However, the Department was entirely unprepared to handle the amount of borrowers' requests to be placed back on a payment plan.

169.

In or about April 2025, the Department very publicly announced that it would begin declaring moving borrowers toward delinquency and default.

170.

Millions of borrowers then reached out to the Department seeking information about payment plans, the balance remaining on their student loans, and many attempted to update their address and other pertinent information with the Department.

171.

Unfortunately, the Department was not prepared and continues to not be prepared to handle this influx of calls and failed to accommodate borrowers' need for information, payment plans, and updates of personal information.

172.

Despite the Department's inability to serve its borrowers, it began to place borrowers in categories of delinquency and default via an automated system.

173.

The Department's automatic system of tracking borrowers' status on their loans placed borrowers in the first stage of delinquency after 30 days of missed payments, the second stage of delinquency after 60 days of missed payments, the third stage of delinquency after 90 days of missed payments, the fourth stage of delinquency after 120 days of missed payments, and ultimately in the default category after 270 days of missed payments.

174.

These categorizations of delinquency beginning at 90 days and continuing thru categorization of being in-default were reported by the Department to Defendants Experian, Equifax, and TransUnion.

175.

Upon being categorized as seriously delinquent or in default, borrowers'

credit scores decreased significantly.

176.

The borrowers' decrease in credit scores were then reported by Experian, Equifax, and TransUnion to borrowers' respective credit card companies which raised borrowers' interest rates accordingly.

177.

Critically, the borrowers' reported seriously delinquent or default statuses submitted to the credit bureaus were neither fair nor accurate.

178.

The borrowers' negative credit statuses were unfair and inaccurate because they were based on the Department's automated system which rolled borrowers into default with no regard to whether the borrowers attempted to have themselves placed back on a payment plan.

179.

In fact, many borrowers who had not missed a single payment since the deferral of their loans were placed in default due to the Department's automated system.

180.

Again, the Department lacked and continues to lack adequate means necessary to process borrowers' requests to be placed back on payment plans, update their

addresses, or even to validate their outstanding balance.

181.

Additionally, many of the borrowers never received notice that their account with the Department was headed towards a default status because the borrowers were unable to update their addresses with the Department and, as a result, the Department did not send such notices to the correct addresses of borrowers.

182.

Therefore, the information reported to the credit bureaus which damaged borrowers' credit scores was unfair and inaccurate.

183.

As a result, Plaintiffs and the class suffered actual damages, including credit denials, increased borrowing costs, lost economic opportunities, and emotional distress. Plaintiffs and the class seek actual damages, punitive damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681o.

**COUNT III:**
**VIOLATIONS OF FCRA SECTIONS 1681e(d) and 1681i**
**(Defendants Experian, Equifax, and TransUnion)**

184.

Plaintiffs hereby plead and incorporate by reference all of the allegations contained in Paragraphs 1 through 135, as if the same were set forth herein.

185.

Defendants Experian, Equifax, and TransUnion are obligated under the FCRA to follow reasonable procedures to assure the maximum possible accuracy of consumer reports. 15 U.S.C. § 1681e(b).

186.

To determine whether a credit reporting agency has taken reasonable procedures to assure the maximum possible accuracy of consumer reports, a court must ascertain whether the procedures followed by the agency pose an unreasonable risk of producing error. *Equifax Inc. v. F.T.C.,* 678 F.2d 1047, 1052 (11th Cir. 1982).

187.

Here, Defendants Experian, Equifax, and TransUnion followed procedures that created an unreasonable risk of producing errors because they failed to adequately investigate whether the consumer credit information provided by the Department was fair and accurate. This is especially egregious due to clear evidence and the enormous magnitude of the number of Defendants that are being characterized and being reported seriously delinquent or in default, as well as due to evidence that Defendants Experian, Equifax, and TransUnion knew or should have known that the negative credit status information from the Department is both unfair and inaccurate.

188.

Rather than conducting an investigation as to whether the Department's information was fair and accurate, Defendants Experian, Equifax, and TransUnion hid their disbelief and relied on the Department's representations that the borrowers placed in negative credit status were properly placed in delinquency or default. It must be concluded that the credit bureaus were and have been unwilling to challenge the United States government's reporting.

189.

Defendants Experian, Equifax, and TransUnion's procedure of blindly and unquestionably relying on unverified information from the Department created an unreasonable risk of producing errors in credit bureaus reports because the information provided by the Department was not fair or accurate, and Defendants Experian, Equifax, and TransUnion took no other steps to verify the accuracy of the Department's representations. At a minimum Defendants Equifax, Experian, and TransUnion should have performed operational process and data reliability verification of the Department as a credit information furnisher, especially when Defendant TransUnion, Equifax, and Experian own internal studies were showing extraordinarily high reports of serious delinquent and default projections.

190.

In June 2025, Defendant TransUnion published a report stating that the

number of accounts being reported as being in default, or headed to default, was unprecedented. At that time, this report specifically stated that one in three of the 43 million student loan borrowers was either in default or at risk of being in default. Since publishing this report, the number of accounts being categorized as seriously delinquent and headed to default has risen dramatically. The information from this report and also similar information from a report on student loan delinquencies and defaults issued by the Federal Reserve Bank should have caused Transunion as well as Experian and Equifax to seriously question the validity of information furnished by the Department related to delinquencies and defaults.

191.

As a result, Defendants Experian, Equifax, and TransUnion violated 15 U.S.C. § 1681e(b) by employing a procedure that takes no steps to protect borrowers from the dissemination of unfair and inaccurate information by the Department and in fact are complicit, willing, and beneficiaries of improper negative credit bureau reporting. Also important to note that credit bureau companies made money from negative credit status reporting, specifically from "E-Oscar" administration.

192.

Additionally, Defendants Experian, Equifax, and TransUnion are obligated to investigate and reinvestigate consumer disputes of credit information that the consumer claims is inaccurate. § 1681i(a)(1)(A), and specifically have a legal and

institutional trust obligation to do-no-harm.

193.

Despite an enormous number of complaints from consumers that the Department has inaccurately reported them as being seriously delinquent or in default on their student loans, Defendants Experian, Equifax, and TransUnion have failed to conduct a reasonable investigation as to the information furnished by the Department; instead, these Defendants simply turn-the-crank on E-Oscar dispute claims and collect money in the process.

194.

Rather than investigating the fairness or accuracy of information supplied by the Department, Defendants Experian, Equifax, and TransUnion take credit history output information from the Department, without questioning whether such information is fair and accurate and without regard to borrowers' disputes as to the accuracy of the information supplied by the Department. Said Defendants include this information in an individual's credit file and credit score.

195.

Defendants Experian, Equifax, and TransUnion thereby have failed to comply with the investigation requirements of 15 U.S.C. § 1681i.

196.

Pursuant to 15 U.S.C. § 1681i, Plaintiffs are entitled to all damages available

as a result of the violation of the provisions contained therein, in an amount to be proven at trial.

## COUNT IV
## DECLARATORY AND INJUNCTIVE RELIEF
## (28 U.S.C. §§ 2201–2202; 15 U.S.C. § 1681s-2(b))
## (Defendant Department of Education)

197.

Plaintiffs hereby plead and incorporate by reference all of the allegations contained in Paragraphs 1 through 135, as if the same were set forth herein.

198.

An actual and justiciable controversy exists between Plaintiffs and the class, on the one hand, and the Department, on the other, concerning the Department's systemic furnishing of inaccurate information and its failure to reasonably investigate disputes under the FCRA.

199.

Plaintiffs and the class seek a declaration pursuant to 28 U.S.C. § 2201 that the Department's furnishing and each of the defendants investigative practices violate the Fair Credit Reporting Act.

200.

Plaintiffs and the class further seek permanent injunctive relief requiring the Department to:

a. Implement and maintain policies and procedures reasonably designed to

ensure that the information it furnishes to consumer reporting agencies is fair, accurate, complete, and not misleading;

b. Establish and adhere to standardized protocols for conducting reasonably thorough investigations upon receipt of borrower disputes from consumer reporting agencies;

c. Correct, delete, or block inaccurate information previously furnished concerning class members;

d. Undergo independent compliance monitoring and periodic auditing to ensure ongoing adherence to its obligations under the FCRA in the same manner that regulated financial institutions must meet compliance standards; and,

e. Provide class members with notice of corrections made to their consumer reports and  furnish such corrected information to all consumer reporting agencies to which inaccurate data was previously reported.

201.

Without declaratory and injunctive relief, Plaintiffs and the class will continue to suffer irreparable harm from the Department's ongoing systemic failures, as inaccurate and harmful information will remain on consumer credit reports and the Department's deficient investigation practices will persist.

202.

Plaintiffs and the class therefore request that the Court issue appropriate declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and its equitable powers, in addition to damages and reasonable attorneys' fees.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

demand trial by jury on all issues so triable.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1)    The Summons and Process be issued to Defendants and that Defendants be served as provided by law;

2)    That this matter be tried before a jury of twelve;

3)    That judgment be awarded for and in favor of Plaintiffs and the other class members and against Defendant Department of Education on Count I for Willful Violation of the FCRA, and grant Plaintiffs and the other class members all relief allowable pursuant to 15 U.S.C. § 1681n, including payment to each class member of not less than $100,000 in compensatory damages, with the specific amount to be determined at trial;

4)    That judgment be awarded for and in favor of Plaintiffs and the other class members and against Defendant Department of Education on Count II for Negligent Violation of the FCRA, and grant Plaintiffs and the other class members all relief allowable pursuant to 15 U.S.C. § 1681o, including payment to each class member of not less than $100,000 in compensatory damages, with the specific amount to be determined at trial;

5)    That judgment be awarded for and in favor of Plaintiffs and the other class members and against Defendants Experian, Equifax, and TransUnion on Count III for Violations of FCRA §§ 1681e(d), 1681i, and grant Plaintiff and the other class

members all relief allowable pursuant to 15 U.S.C. § 1681, including payment to each class member of not less than $100,000 in compensatory damages, with the specific amount to be determined at trial;

6)    That judgment be awarded for and in favor of Plaintiffs and the other class members and against all Defendants for Count IV for Declaratory and Injunctive Relief including an order requiring (a) the Defendant Department of Education to stop furnishing any and all information to the credit bureaus and the credit bureaus to stop accepting or reporting any information reported by the Department, (b) Defendants to remove all federal student loan information reported to the credit bureaus since January 1, 2025, from the class members' credit reports, (c) that any student loan funds collected since January 1, 2025, by the U.S. Treasury by way of Administrative Wage Garnishment or Treasury Offset be returned to the Plaintiffs and other class members, and (d) that all U.S. Treasury Wage Garnishments and Treasury Offsets related to federal student loans immediately stop;

7)    That Plaintiffs and the other class members be allowed to discharge their student loan debt under personal bankruptcy, without challenge from the Defendant Department of Education or any other agency or part of the Federal government;

8)    That Defendant Department of Education not be allowed to sell any

federal student loan accounts or account balances associated with any of the Plaintiffs or other class members; and,

9) For such other and further relief as the Court shall deem just and proper.

Respectfully submitted, this 29th day of October, 2025.


/s/ M. Devlin Cooper
M. DEVLIN COOPER
Georgia Bar No. 142447
KENNETH E. BARTON
Georgia Bar No. 301171
HENRY CHILDS
Texas Bar No. 24098864
*To Seek Admission pro hac vice*
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: (478) 841-9007
Facsimile: (478) 841-9002
mdc@cooperbarton.com
keb@cooperbarton.com
hchilds@cooperbarton.com